UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
:
JUDITH PURCELL                                          :        3:17 CV 1616 (RMS)
                                                        :
V.                                                      :
                                                        :
NANCY A. BERRYHILL,                                     :
ACTING COMMISIONER OF                                   :
SOCIAL SECURITY[1]                                      :        DATE: JAN. 28, 2019
                                                        :
------------------------------------------------------- x

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING
THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff Disability Insurance benefits ["DIB"].

I.  ADMINISTRATIVE PROCEEDINGS

On or about March 14, 2014, the plaintiff filed an application for DIB benefits claiming she has been disabled since January 1, 2009 due to degenerative hip disease, arthritis in her left hip, "right hip condition[,]" and bilateral knee "condition[.]" (Certified Transcript of Administrative Proceedings, dated November 28, 2017 ["Tr."] 171-72, 195, 198, 231, 233). The plaintiff's application was denied initially (Tr. 108-11), and upon reconsideration. (Tr. 114-16). On October 21, 2014, the plaintiff requested a hearing before an Administrative Law Judge ["ALJ"] (Tr. 117-18), and on May 12, 2016, a hearing was held before ALJ John Noel, at which

---

[1] On January 21, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. The Federal Vacancies Reform Act limits the time a position can be filled by an acting official, 5 U.S.C. 3349(b); accordingly, as of November 17, 2017, Nancy Berryhill is serving as the Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security.

the plaintiff and a vocational expert testified. (Tr. 44-77; *see* Tr. 148-70). On June 23, 2016, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits. (Tr. 16-26). On July 19, 2016, the Appeals Council received the plaintiff's request for review of the hearing decision (Tr. 9-10), and on July 26, 2017, the Appeals Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On September 26, 2017, the plaintiff filed her complaint in this pending action (Doc. No. 1), and on December 18, 2017, the defendant filed her answer and administrative transcript, dated November 28, 2017. (Doc. No. 14). On January 26, 2018, the parties consented to the jurisdiction of a United States Magistrate Judge (*see* Doc. No. 18); the case was transferred to Magistrate Judge Joan G. Margolis. (Doc. No. 19). On February 20, 2018, the plaintiff filed her Motion for Reversal or Remand (Doc. No. 20), with Statement of Material Facts (Doc. No. 20-1) and brief in support (Doc. No. 20-2 ["Pl.'s Mem."]). On March 21, 2018, the defendant filed her Motion to Affirm (Doc. No. 21), and brief in support (Doc. No. 21-1 ["Def.'s Mem."]). On May 1, 2018, this case was reassigned to this Magistrate Judge. (Doc. No. 23).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 20) is *denied*, and the defendant's Motion to Affirm (Doc. No. 21) is *granted.*

II.   FACTUAL BACKGROUND

At the time that the plaintiff filed her application for benefits, she was 58 years old and living in an in-law apartment attached to her daughter's home. (Tr. 171-72, 211). The plaintiff attended college for three years. (Tr. 199). She worked as a sales representative for fifteen years before she "became unable to work." (Tr. 200). Prior to working as a sales representative, she

2

worked as an owner and director of a nursery school and worked at an indoor plant landscaping business. (Tr. 240).

The plaintiff reported in her application for benefits that she stopped working as a sales representative when the company "downsized." (Tr. 199). The plaintiff explained that her "degenerative hip disease was diagnosed in 2005. Although for a time [she] worked, while suffering, [she] became severely unable to work around 2008/2009, after [she] stopped working for [her] employer." (Tr. 199). The plaintiff, however, also testified that in 2010, she was able to care for her father by making him meals and keeping him company. (Tr. 62-63, 65). According to the plaintiff, by 2013, she could not stand for an hour, nor could she walk for a city block because walking made her pain "[h]orribly worse." (Tr. 62, 66). She claimed that her gait was "very unstable" in 2013 as well. (Tr. 70). She could not stand in place because of pain, so she solicited help from "good friends" and her daughter. (Tr. 67). Additionally, she could sit for "maybe 20 minutes to a half an hour depending on the day[.]" (Tr. 71). She could spend only 15 to 20 minutes out of an eight-hour day on the computer. (Tr. 72). The plaintiff could perform household cleaning tasks, and her adult daughter would help, especially with tasks involving bending and lifting. (Tr. 63-64). Her chores would "take[] . . . a lot more time and [the] chores [would] have to be spread out." (Tr. 212). The plaintiff also testified that she has had trouble sleeping due to pain since 2005. (Tr. 68).

At the hearing, a vocational expert testified that a hypothetical individual who is limited to the full range of light work, with the ability to occasionally climb ramps or stairs, never climb ladders or scaffolds, and occasionally balance, stoop, kneel, crouch and crawl, could perform the plaintiff's past work as a director of a preschool program, a sales representative, and a customer service representative. (Tr. 75-76). If that hypothetical person was limited to sedentary work, the

3

person could perform work as a "customer service representative[,]" but could not perform the two jobs that the plaintiff performed previously. (Tr. 76). If the hypothetical person was off task ten percent of the time, or absent one day a month, it "would be very difficult to maintain any type of employment." (Tr. 76). Additionally, if the "worker took three additional [break] periods of 10 to 15 minutes, each time throughout the hour[,]" that person could not maintain employment. (Tr. 76-77).

III. THE ALJ'S DECISION

Following the five-step evaluation process,[2] the ALJ found that the plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of January 1, 2009 through her date last insured of March 31, 2013. (Tr. 21, citing 20 C.F.R. § 404.1571 *et seq.*). The ALJ concluded that, through her date last insured, the plaintiff had the severe impairment of bilateral hip degenerative joint disease (Tr. 20-21, citing 20 C.F.R. §§ 404.1520(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 22, citing 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526). The ALJ found that, after careful consideration of the entire record, the plaintiff had the residual functional capacity ["RFC"] to perform light

---

[2] An ALJ determines disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

4

work as defined in 20 C.F.R. § 404.1567(b) except she could only occasionally climb ramps and stairs, never climb ladders, ropes and scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 22-25). The ALJ concluded that, through her date last insured, the plaintiff could perform her past relevant work as a sales representative, and that work did not require the performance of work-related activities precluded by the claimant's residual functional capacity. (Tr. 25, citing 20 C.F.R. § 404.1565). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from January 1, 2009, the alleged onset date, through March 31, 2013, the date last insured. (Tr. 26, citing 20 C.F.R. § 404.1520(f)).

IV. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. *See Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citation omitted); *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) (citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its

5

judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V. DISCUSSION

The plaintiff contends that the ALJ erred in his review of the medical evidence as the medical evidence and testimony "indicated onset prior to the [date last insured] per [Social Security Ruling] 83-20[.]" (Pl.'s Mem. at 8-12). Specifically, the plaintiff argues that, under SSR 83-20, the ALJ should have considered the slow progression of her impairment, the date that she stopped working, and the opinion of a medical expert. (Pl.'s Mem. at 8-15). Additionally, the plaintiff contends that the ALJ "misstated the record[]" in his discussion of Dr. Phillip Mongelluzzo's opinion; he mischaracterized the evidence after the evaluation of Dr. Robert Kennon; he erroneously interpreted the phrase "doing well[]"; and, he erred in his treatment of Dr. Mongelluzzo's and Dr. Kennon's opinions. (Pl.'s Mem. at 15-25). The plaintiff argues that the ALJ erred in his assessment of the lack of medical treatment (Pl.'s Mem. at 25-27) and erred in his decision that the plaintiff's impairment did not meet Listing 1.02 because there was no evidence of ineffective ambulation. (Pl.'s Mem. at 27-32). Finally, the plaintiff argues that the ALJ erred in his credibility determination. (Pl.'s Mem. at 33-36).

In response, the defendant contends that the ALJ did not err in concluding that the plaintiff's lumbar spine impairment did not satisfy Listing 1.02 (Def.'s Mem. at 6-8); substantial

6

evidence supports the ALJ's RFC determination (Def.'s Mem. at 8-18); and, SSR 83-20 is inapplicable to the plaintiff's case as SSR 83-20 "only applies when a claimant has been found disabled and is necessary to determine a disability onset date." (Def.'s Mem. at 19-20).[3]

A. LISTING 1.02

The plaintiff contends that the ALJ erred in her conclusion that the plaintiff's impairment does not meet Listing 1.02. (Pl.'s Mem. at 27-32).

A Listing 1.02 impairment is

> [c]haracterized by gross anatomical deformity (*e.g.*, subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> > A. Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; . . . .

20 C.F.R. Part 404, Subpt P., App. 1, Listing 1.02.

An "inability to ambulate effectively" is defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00B2b(1). Examples of ineffective ambulation, as stated in the Regulations, include, *inter alia*:

> the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, . . . the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Id.* 1.00B2b(2).

---

[3] The Court will address each of the plaintiff's arguments, but in a different order than they are listed in her memorandum.

The "determination 'whether an individual can ambulate effectively ... [is] based on the medical and other evidence in the case record, generally without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2) and 1.00B2c.'" *Wright v. Berryhill*, No. 3:17 CV 501(JAM), 2018 WL 3993442, at *4 (D. Conn. Aug. 21, 2018) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00B2a) (citing *Rodriguez v. Comm'r of Soc. Sec.*, No. 2:14 CV 2432(CCC), 2015 WL 5771619, at *5 (D.N.J. Sept. 30, 2015)). In his decision, the ALJ concluded at step three of the sequential analysis that

> Listing 1.02 is not met because the evidence does not support a finding that the claimant was unable to ambulate effectively as contemplated by section 1.00B2b. The treatment notes from the relevant period indicate no observation of gait abnormality, or any abnormality of the lower extremities.
>
> Additionally, no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairments, individually or in combination.

(Tr. 22).

The plaintiff is correct that the ALJ did not address the medical records in his limited step three analysis recited above. That said, however, the "absence of an express rationale for an ALJ's conclusions" regarding a listed impairment "does not prevent [the Court] from upholding them so long as [the Court is] able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x. 109, 112 (2d Cir. 2010) (summary order) (citation and internal quotation marks omitted). In this case, in his determination of the plaintiff's RFC at step four of the sequential analysis, the ALJ discussed the plaintiff's activities of daily living, her work history, and her medical treatment for bilateral hip osteoarthritis, which dated back to 2005. (Tr. 22-23).

As the ALJ recounted in his decision, the plaintiff was evaluated in December 2005 by Dr. Robert Kennon of Orthopaedic Surgery, P.C., for left hip pain. (Tr. 262-63; *see* Tr. 264-65). At

that time, she had a slight limp and limited range of motion in her left hip; imaging taken in December 2003 revealed "severe" degenerative changes. (*See* Tr. 263). This assessment, as the ALJ noted, was three years before the plaintiff's alleged onset date. (Tr. 23). Additionally, as the ALJ pointed out, the plaintiff continued to work as a sales person through the end of 2008 – "driving from each [sales] appointment[] and walking from the appointment to [her] car" all throughout the day. (Tr. 23). Moreover, as the ALJ made clear, although the plaintiff testified that she eventually left that job in January 2009 "due to a worsening ability to walk[,]" she did not return to a doctor until April 2009, at which point, as the ALJ found, "she did not report any increase in pain or decrease in ability to walk." (Tr. 23). Specifically, at her April 28, 2009 appointment with her primary care provider, Dr. Phillip Mongelluzzo, the plaintiff's left hip osteoarthritis was described as "[s]table, but it still g[a]ve[] her problems." (Tr. 279-81). There was no reference to an inability to work; at that time, "[s]he was caring for her father[.]" (Tr. 23; *see* Tr. 279-81). As the ALJ concluded, "[that activity was] not consistent with a major worsening of symptoms that would corroborate her stated reason for leaving her job." (Tr. 23).

In December 2011, Dr. Mongelluzzo noted the plaintiff's reports of "crepitation, decreased range of motion, instability and joint pain[,]" but he assessed that the plaintiff "appear[ed] to be doing fairly well[]" even while he noted that the plaintiff's left hip osteoarthritis was "getting worse and she required chronic narcotics." (Tr. 271-72). Bearing in mind the plaintiff's date last insured was March 31, 2013, the plaintiff acknowledged in her brief that she did not begin using a cane until two years later. (Pl.'s Mem. at 28). Also, as the ALJ appropriately discussed, in the plaintiff's April 2014 statement regarding her daily activities, she reported feeding her cats, cleaning their litter, doing household chores spread out over the course of day, making meals,

9

shopping, performing self-care tasks, driving, and going out "dail[y[.]" (Tr. 24; *see* Tr. 211-15). She also reported that, as of 2014, she "sometimes" needed a cane. (Tr. 216).

The record supports the ALJ's conclusion that the plaintiff did not establish the inability to ambulate effectively as required by Listing 1.02. Although at step three, the ALJ did not discuss the records, or the lack thereof, regarding the plaintiff's ambulation, this information is thoroughly addressed in the ALJ's step four analysis. *See Salami*, 371 F. App'x at 112; *see also Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982) (affirming ALJ's decision at step three even though he did not articulate a rationale "since portions of the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence"). Thus, remand on this issue is not necessary as this Court "is able to look to other portions of the ALJ's decision to conclude that his step three finding is supported by substantial evidence." *Daniels v. Berryhill*, No. 3:16 CV 1181(SALM), 2017 WL 2798500, at *7 (D. Conn. Jun. 28, 2017).

### B. THE ALJ DID NOT ERR IN HIS RFC DETERMINATION AND HIS TREATMENT OF THE OPINIONS OF RECORD

In his decision, the ALJ concluded that, through the plaintiff's date last insured, she retained the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) with "occasional[]" postural and climbing limitations. (Tr. 22-23). In reaching this conclusion, the ALJ assigned "[g]reat weight" to the State agency medical consultants' assessments. (Tr. 24). He found them to be acceptable medical sources "based on their findings" and "on a thorough review of the record." (Tr. 24). And he found their opinions of the plaintiff's "assessed light work capacity with the given postural limitations" to be "generally consistent" with the evidence. (Tr. 24).

On July 17, 2014, Dr. Earle Sittambalam completed a Physical Residual Functional Capacity Assessment of the plaintiff in which he found that she was capable of occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, and standing, walking and

sitting for six hours in an eight-hour day. (Tr. 88). Additionally, Dr. Sittambalam found that the plaintiff could occasionally climb ramps or stairs, balance, crouch and crawl, and could frequently stoop and kneel. (Tr. 88). He noted that the plaintiff had "severe arthritis of both hips, left worse than right[]" since 2003, and that her "symptoms [had] progressed gradually requiring chronic narcotic therapy[,]" but that as of March 27, 2013, her pain was "controlled with Percocet." (Tr. 89). He also noted that the plaintiff "[drove], shop[ped] and [went] out alone[,]" and that the "[u]se of [a] cane [was] not indicated and not documented in the [medical record]." (Tr. 88). On September 16, 2014, Dr. Jeanne Kuslis completed a Physical Residual Functional Capacity Assessment of the plaintiff in which she found the same limitations as Dr. Sittambalam found. (Tr. 100-01).

The Second Circuit has recognized that "[t]he opinions of non-examining medical personnel cannot, in themselves and in most situations, constitute substantial evidence to override the opinion of a treating source." *Schisler v. Sullivan*, 3 F.3d 563, 570 (2d Cir. 1993). However, the opinions of non-examining sources may "override treating sources' opinions, provided they are supported by evidence in the record." *Id.* (citing 20 C.F.R. §§ 404.1527(f) and 416.927(f)).

In his decision, as discussed above and further below, the ALJ considered the plaintiff's treatment with Dr. Kennon in 2005, the fact that she continued to work until 2009, that she cared for her father until his death in 2010, that she returned to treatment with Dr. Mongelluzzo in April 2009 and "did not report any increase in pain or decrease in ability to walk[,]" (Tr. 23), and that she did not begin treatment with an orthopedic specialist until April 2014, nearly a year after her date last insured. (Tr. 23-24). The ALJ also considered the plaintiff's ability to perform many activities of daily living, including caring for her pets, cooking, shopping for food, and performing household chores at a slower pace, with breaks, which are consistent with the ability to perform

11

light work. (Tr. 23); *see Cichocki v. Astrue*, 729 F.3d 172, 178 (2d Cir. 2013) (holding that the ALJ properly considered the claimant's ability to walk her dogs and clean her house as consistent with an RFC to perform light work).[4]

In this case, in assigning "[g]reat weight" to the opinions of these State agency consultants who relied on the medical record spanning 2005 to 2014, the ALJ properly explained that their opinions were consistent with the record as a whole, including the plaintiff's treatment history with Dr. Kennon and Dr. Mongelluzzo, her treatment with Dr. Richard Matza, a reconstructive orthopedic surgeon, her work history, and her daily activities. In reaching this conclusion, the ALJ thoroughly addressed the opinions of Drs. Matza and Mongelluzzo, as discussed below, and the reason for the weight he assigned those opinions.

In his consideration of Dr. Matza's undated opinion, the ALJ noted that it "does not accurately describe the claimant's function" during the relevant time period. (Tr. 24). The ALJ assigned "little weight" to the check-box form completed by Dr. Matza, as the plaintiff did not begin treatment with Dr. Matza until April 28, 2014 – more than a full year after her date last insured. (Tr. 467). As of April and May 2014, the objective medical testing – an MRI and CT scan of the plaintiff's hips — revealed "marked joint space narrowing, osteophyte formation, subchondral sclerosis and subchondral cyst formation in the bilateral hips[]" (Tr. 282, 296), as well

---

[4] Although the plaintiff contends that the ALJ's "flawed credibility determinations as to daily activities" and a lack of a "function-by-function" analysis of the plaintiff's work-related abilities, led to "a faulty RFC[]" (Pl.'s Mem. at 32-33), the ALJ's discussion of the plaintiff's work history, daily activities, and reports of pain, reflects the ALJ's consideration of the evidence of record, upon which he based his RFC. The Second Circuit has declined to adopt a "*per se* rule[]" that an ALJ's failure to conduct an explicit function-by-function analysis at Step Four requires remand. *Cichocki*, 729 F.3d at 176-77 (citations omitted) (holding that remand is not necessary when the ALJ's analysis allows for "meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence[]"). Moreover, the ALJ's credibility determination is entitled to "great deference and can be reversed only if they are 'patently unreasonable.'" *Pietrunti v. Dir., Office of Workers' Comp. Programs*, 119 F.3d 1035, 1042 (2d Cir. 1997) (citation omitted); *see also Wright v. Berryhill*, 687 F. App'x 45, 49 (2d Cir. 2017) (summary order) (describing the scope of review of an ALJ's credibility determination as "sharply limited"). In light of the record in this case, the ALJ's RFC analysis allows for meaningful judicial review, and the Court cannot conclude that the ALJ's credibility determination was "patently unreasonable[.]" *Pietrunti*, 119 F.3d at 1042.

as "[s]evere left hip joint osteoarthritis with associated remodeling." (Tr. 284). In his records, Dr. Matza noted that the plaintiff had "markedly diminished range of motion of the left hip[,]" with a short left lower extremity compared to the right. (Tr. 286-87). Additionally, in May 2014, Dr. Matza described the plaintiff's condition as "marked degeneration of her hip, left hip is worse than right." (Tr. 285). Two months later, the plaintiff underwent bilateral hip replacement surgery. Thus, it was clear that, in 2014, the plaintiff's condition was severe enough, as reflected in the objective medical records, to require surgery. That said, however, "regardless of the seriousness of [the plaintiff's] [then-]present disability, unless [the plaintiff] became disabled before [her date last insured, March 31, 2013,] [she] cannot be entitled to benefits." *Arnone v. Bowen*, 882 F.2d 34, 38 (2d Cir. 1989) (multiple citations omitted).

As the ALJ explained, he assigned "little weight" to Dr. Matza's opinion because Dr. Matza did not treat the plaintiff prior to the date last insured and he "consider[ed] impairments such as a shoulder impairment and knee impairments that did not exist prior to the date last insured." (Tr. 25). Here, the relevant time period was January 2009 through March 2013. As the ALJ appropriately noted, "[i]t was not until about a year after the date last insured that [the plaintiff] began significant treatment for her hip pain and other impairments, including regular orthopedic care and surgeries." (Tr. 24); (*see* Tr. 300 (June 2014: treatment following "left total hip replacement[]"); 307 (October 2014: "followed along for bilateral total hip replacement. She is doing fine relative to her hips."); 309 (August 2014: "advanced degenerative arthritis of the right hip with excellent progress following total left hip replacement"); Tr. 308 (September 2014: ambulating with a cane; "doing satisfactorily[]"; "[e]xcellent progress following bilateral total hip replacements[]"); Tr. 307 (October 2014: severe degeneration in the right knee; recommended "treat[ing] conservatively with an unloader brace and a cane."); Tr. 302-04 (June-October 2015:

13

treatment following right total knee replacement); Tr. 305 (April 2015: pain on range of motion of the right knee); Tr. 306 (treatment for right knee degeneration)). Thus, while "'the dearth of contemporaneous evidence [does not] *necessarily* preclude[] [the plaintiff's] entitlement to a 'period of disability[,]' . . . . [t]he initial burden of establishing the claimed disability was on [the plaintiff][,]'" and the plaintiff did not establish a continuous disability from her alleged onset date to the date that these medical opinions were issued. *Queiroga v. Berryhill*, No. 3:16 CV 16(SRU), 2017 WL 1156729, at *8 (D. Conn. Mar. 28, 2017) (emphasis in original) (quoting *Arnone*, 882 F.2d at 38-39).

In fact, the ALJ's conclusion that the plaintiff failed to establish that she was disabled prior to her date last insured, is supported by substantial evidence in the record. As the ALJ discussed in his decision, and as discussed in Section IV.A. *supra*, the plaintiff first sought treatment from Dr. Kennon in 2005, but, at that time and for the next three years, the plaintiff continued to work with the painful limitations she described to Dr. Kennon. (*See* Tr. 23; *see also* Tr. 186-87, 198, 205). Additionally, the longitudinal treatment records from the plaintiff's primary care provider, Dr. Mongelluzzo, revealed that, though the plaintiff's hip pain required an increase in medication over time, her condition was described as largely "stable" during the relevant period at issue in this case. (Tr. 24; *see* Tr. 267-81).[5]

The plaintiff argues that the ALJ's treatment of Dr. Mongelluzzo's records reflects an "erroneous reading" of the doctor's findings (Pl.'s Mem. at 15-17), but, in his decision, the ALJ documented the treatment record by noting both the increase in symptoms and the assessment that

---

[5] *See* Tr. 279-81 (April 28, 2009: "[s]table, but it still gives her problems[]"); Tr. 276-78 (May 17, 2010: "[s]table, but it still gives her problems from time to time[]"); Tr. 273-75 (November 22, 2010: "[s]table, but it still gives her problems from time to time[]"); Tr. 270-72 (December 22, 2011: "getting worse and she requires chronic narcotics[]"); Tr. 267-69 (March 27, 2013: "[l]eft hip osteoarthritis – This is getting worse and she requires chronic narcotics and has been for quite some time. She is still in a[]lot of pain[]").

the plaintiff was largely stable. *See Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (holding that when an ALJ "do[es] not give the treating source's opinion controlling weight," he must consider, *inter alia*, the treatment relationship, the evidence supporting the opinion, and the consistency of the opinion with the remaining medical evidence). Yet, as the ALJ notes in his decision, in Dr. Mongelluzzo's August 14, 2014 opinion, he "assessed a less-than-sedentary work capacity with no postural abilities and restrictive environmental limitations." (Tr. 24). That opinion was inconsistent with Dr. Mongelluzzo's contemporaneous treatment notes for the relevant period. Additionally, that opinion was rendered more than a year after the plaintiff's date last insured, and about two weeks after she underwent bilateral hip surgery. (*See* Tr. 461, 772 ("Uses cane daily. Uses walker. 2 weeks post surgery."), Tr. 768, 773 ("still healing from 2 hip replacements. Still walking with a cane and using a knee brace. Will be going in for a full knee replacement and will be rehabbing from that.")).

The plaintiff also contends that that the ALJ erred in not assigning more weight to Dr. Mongelluzzo's opinion because it was rendered in connection with the plaintiff's application for benefits from the Connecticut Department of Social Services ["DSS"], and DSS granted the plaintiff benefits "in reliance upon the application forms and the report of [this] treating source[.]" (Pl.'s Mem. at 22); (*see* Tr. 24, 454-65, 763-70). A decision by a State agency on the issue of disability, however, is "not binding and is not [the Social Security Administration's] decision about whether [a claimant is] disabled . . . ." 20 C.F.R. § 404.1504. Moreover, as the ALJ appropriately explained, although the plaintiff "continued to follow with her primary care provider periodically, . . . [she] did not see an orthopedist or other specialist until April 2014 [(*see* Tr. 286-87)], about a year after the date last insured[.]" (Tr. 24).[6] The plaintiff's pre-March 2013 treatment record, and

---

[6] Although the plaintiff argues that she did not pursue treatment from a specialist or undergo surgery because she was uninsured at the time, the plaintiff testified that, when she was told about hip replacement in 2005, "there was a level

the fact that she continued to perform work at the level of substantial gainful activity, as defined under the Regulations,[7] simply does not support her argument that it was error to "say that the Social Security Administration is not bound by the decision of the Department of Social Services because it was after the [date last insured], because it [was] clear that [the plaintiff] already had severe degeneration as of her [date last insured]." (Pl.'s Mem. at 23). Contrary to the plaintiff's assertion, the ALJ adequately explained the lack of support in the record for that conclusion.

In sum, to be eligible for benefits, the plaintiff must show that she had a disabling condition, lasting 12 months or longer, within the period of coverage, which in this case was January 1, 2009 through March 31, 2013. *See* 42 U.S.C. § 404.320(a); (Tr. 21, 170-71). A claimant must be fully insured at the time that a period of disability starts. *See* 20 C.F.R. § 404.320(b)(2) (applicant must be insured in the calendar quarter the he or she is disabled). In this case, the plaintiff has not satisfied her burden, and the ALJ's thorough decision is supported by substantial evidence in the record.

C. SSR 83-20 IS INAPPLICABLE TO THE PLAINTIFF'S CASE

The plaintiff argues that her impairment was "slowly progressive from at least 2002 or 2003[,]" so "a reasonable inference should have been drawn about the course of her condition in the eight years between 2005 and 2013." (Pl.'s Mem. at 8, 10). Accordingly, the plaintiff argues that the ALJ erred in failing to obtain medical expert testimony pursuant to Social Security Ruling ["SSR"] 83-20. (Pl.'s Mem. at 14-15). The plaintiff contends that the "objective evidence" in

---

of concern and fear and surgery and, you know, I was taking care of my father at the time. So, I put it off . . . ." (Tr. 56). Thus, the plaintiff's contention that the ALJ erred in considering the fact that the plaintiff did not seek care from a specialist prior to 2014 or pursue surgery after Dr. Kennon's 2005 assessment is not well-taken.

[7] To be eligible for disability benefits, a claimant must be unable to engage in substantial gainful activity which is defined by the amount of monthly earnings, depending on the nature of the person's disability. 20 C.F.R. §§ 404.1571-1576.

2005 was "evidence of an advanced, serious and painful condition[,]" and this "objective evidence . . . [was] disregarded[.]"  (Pl.'s Mem. at 9).

SSR 83-20 reads:

> In addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability. In many claims, the onset date is critical; it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits. In title II worker claims, the amount of the benefit may be affected; in title XVI claims, the amount of the benefit payable for the first month of eligibility may be prorated. Consequently, it is essential that the onset date be correctly established and supported by the evidence, as explained in the policy statement.

1983 WL 31249, at *1 (1983). The plain language of this SSR is clear – the determination of the onset date of disability is made *after* a finding of disability. *Id.* The Second Circuit has reiterated that an "ALJ's determination that [the] plaintiff was not disabled obviate[s] the duty under SSR 83-20 to determine an onset date." *Baladi v. Barnhart*, 33 F. App'x 562, 564 (2d Cir. 2002) (summary order). Accordingly, SSR 83-20 in inapplicable to this case.

As discussed above, substantial evidence supports the ALJ's decision that the plaintiff was not disabled within the applicable period of coverage. The treating providers did not offer retrospective opinions about the plaintiff's impairment at the time she was insured, and, as discussed above, while "'evidence from earlier years could demonstrate that [the plaintiff's] condition would not improve, . . . the initial burden of establishing the claimed disability'" is on the plaintiff, and "the ALJ reasonably 'found that the evidence [she] did present failed to establish such a continuous disability.'" *Queiroga*, 2017 WL 1156729, at *8 (quoting *Arnone*, 882 F.2d at 39).

## VI. CONCLUSION

Accordingly, for the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 20) is *denied*, and the defendant's Motion to Affirm (Doc. No. 21) is *granted*.

Dated this 28th day of January 2019 at New Haven, Connecticut.

                                                   /s/Robert M. Spector, USMJ
                                                   Robert M. Spector
                                                   United States Magistrate Judge